1

2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

3

4

5

6

7

8

9

10

CRUZ HERNANDEZ, a Minor, by and
through his Guardian ad Litem, ALICIA
TELLES-HERNANDEZ,

Plaintiff,

v.

SUTTER MEDICAL CENTER OF
SANTA ROSA, *et al.*,

Defendants.

No. C 06-03350 SBA

**ORDER**

[Docket No. 49]

11

**INTRODUCTION**

12

13

14

15

16

17

        Before the Court is defendant United States of America's Motion for Partial Summary

Judgment (the "Motion") [Docket No. 49], plaintiff Cruz Hernandez's Memorandum in Opposition

to the Motion (the "Opposition") [Docket No. 55], defendant's Reply Memorandum regarding the

Motion (the "Reply") [Docket No. 56], plaintiff's Motion for Leave to File Sur-Reply in Response

to Defendant, U.S. Partial MSJ (the "Motion for Leave") [Docket No. 63], and defendant's

Memorandum in Opposition regarding the Motion for Leave [Docket No. 66].

18

19

20

21

22

23

24

25

26

27

28

        In this case, Cruz sued defendants for medical malpractice, under the Federal Tort Claims

Act (the "FTCA"). Cruz alleges defendants' negligence acts, at his delivery legally caused him to

become a spastic quadriplegic with severe mental retardation. Defendants Sutter Medical Center of

Santa Rosa ("SMC") and Natasha Kahl, M.D. have settled. The government now requests the Court

to grant partial summary judgment for it, under Federal Rule of Procedure 56(d)(1), to remove from

trial Cruz's claims against SMC and Dr. Kahl. And, to remove from trial certain opinions of Cruz's

expert witnesses, on the grounds they are speculative or conclusory, and thus inadmissible under

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Civil

Procedure 26(a)(2)(B). The government also requests, in its Reply, that the Court strike one of the

expert's reports, due to alleged difficulties taking his deposition. In turn, Cruz requests in his

///

1  Motion for Leave that the Court to allow him to respond to this strike request, and to two other

2  issues allegedly raised for the first time in the government's Reply.

3        The Court finds this matter suitable for disposition without a hearing under Federal Rule of

4  Civil Procedure 78(b), and as discussed below, DENIES the Motion for three separate and

5  independent reasons.  First, the government failed to meet and confer in good faith, as required by

6  the Court's Standing Order for Civil Cases, which if it had, could have very well obviated the need

7  for the Motion.  In this regard, the Court also finds the government may not use a motion under

8  Rule 56 as a substitute for a motion under Rule 37 or a motion in limine.  Second, in regards to the

9  issue of liability, the government may not proceed under Rule 56(d)(1), because the FTCA does not

10  preempt California's law of joint and several liability.  Also, it may not proceed under this rule at a

11  time when expert discovery was still open and no efficiencies would result, especially as the rule

12  requires the Court to hold hearings.  Third, with regards to Cruz's expert reports, *Daubert* is

13  inapplicable to them, and the government failed to show they failed to meet the standards imposed

14  by Rule 26(a)(2)(B).

15        In addition, the Court DENIES the request in the government's Reply to strike the expert's

16  report, without prejudice, as a reply is an inappropriate vehicle for such a request.  And, it DENIES

17  Cruz's Motion for Leave, as two of the issues of which he complains were initially raised in the

18  government's Motion, while the third issue, the government's strike request, was denied by the

19  Court.

20                              **BACKGROUND**

21  **I.    Factual developments taken from the government's Motion.**[1]

22        Alicia Telles Hernandez was 18 years old and pregnant with her first child at the time she

23  initially presented to the Sonoma County Indian Health Project (SCIHP) for prenatal treatment in

24  March of 2002 at ten weeks gestation.  Mot. at 3:25-26.  She was 5'1" and 216 pounds.  *Id.*

25  ///

26  _____

27  [1]      Except as otherwise noted, these facts are taken from the Motion, which the government
indicated were "undisputed."  Mot. at 3:24.  For those facts for which the government cited to the
28  evidence, the government's citation is provided.  For those facts for which the government failed to
provide a citation, the Court cites to the Motion itself.

1    at 3:26-27.  Her prenatal course was reportedly uneventful, with the exception of a urinary tract

2    infection treated with oral antibiotics, and slightly elevated blood pressure.  *Id.* at 3:27-28.

3          At approximately 11:30 p.m., on October 9, 2002, Hernandez presented to Labor and

4    Delivery at defendant Sutter Medical Center of Santa Rosa[2] ("SMC") with spontaneous rupture of

5    membranes, but no contractions.  *Id.* at 4:1-2.  Don Carlos Steele, M.D.[3] examined her.  Docket

6    No. 50, Ex. "H" at 90:21 (Dep. Tr. of Dr. Steele ("Tr.")).[4]  At 6:00 a.m. the following morning, he

7    placed Hernandez on Pitocin[5] because she showed no regular pattern of contractions.  *Id.* at 129-30.

8    The Pitocin was stopped at 4:50 p.m. that afternoon, and Hernandez was placed on Cytotec,[6] at both

9    three and six hours thereafter.  *Id.*

10         On the evening of October 10, 2002, Hernandez was 2 cm dilated, 100% effaced, and –2

11   station.  Mot. at 4:6-7.  A progress note indicated the presence of cardiac decelerations, but good

12   variability.  Tr. at 132-35.  Internal monitors were placed and Pitocin started again at noon on

13   October 11, 2002.  Mot. at 4:8-9.  Hernandez's blood pressure readings peaked in the 150s and 190s.

14   Tr. at 123-24.

15         Defendant Natasha Kahl, M.D.,[7] the on-call obstetrician, was consulted on October 11, 2002

16   concerning the high blood pressure readings.  *Id.* at 127-28.  She ran some tests in order to rule out

17   preeclampsia,[8] and the results were negative.  *Id.*  Hernandez continued to progress slowly in labor

18

_____

19   [2]      SMC has settled.  Docket No. 50 ¶ 14 (Decl. of Jonathan Unruh Lee ("Lee Decl."))

20
21   [3]      Dr. Steele was initially named as a defendant, but the government substituted in for him.  *See* Docket No. 36.

22   [4]      For reasons unknown, the government provided all 157 pages of Dr. Steele's transcript, but in the entire Motion, only cited to 20 of them.  *See* Docket No. 50, Ex. "H."

23
24   [5]      The government indicated, without cited support, that Pitocin or oxytocin promotes uterine contractions and milk ejection and contributes to the second stage of labor.  Mot. at 4 n.1.

25   [6]      The government indicated, without cited support, that Cytotec or misoprostol is a synthetic prostaglandin E analog administered orally to treat gastric irritation.  Mot. at 4 n.2.

26
27   [7]      Kahl has settled.  Lee Decl. ¶ 14.

28   [8]      The government indicated, without cited support, preeclampsia is a complication of pregnancy characterized by hypertension, edema, and/or proteinuria, when convulsions and coma are associated.  Mot. at 4 n.3.

despite having received additional Pitocin.  *Id.* at 129-30.  Hernandez received epidural anesthesia at 5:35 p.m. on October 11, 2002.  *Id.* at 130-32.  A progress note indicated the presence of cardiac decelerations, but good variability.  *Id.* at 132-35.

At 7:30 p.m., Hernandez was offered a cesarean delivery, but declined, opting to wait an additional hour to see if the labor would progress further spontaneously.  *Id.* at 140-48.  Her labor did not progress and at approximately 9:35 p.m., Cruz Hernandez was delivered by cesarean section due to arrest of labor and occiput[9] positioning.  Mot. at 5:1-2.  Meconium[10] was noted upon delivery.  *Id.* at 5:2-3.  Cruz was taken immediately to the Neonatal Intensive Care Unit (NICU).  *Id.* at 5:3.  Seizure activity was noted at eight hours post-birth.  *Id.* at 5:4.  Cruz remained in the NICU for approximately 12 days.  *Id.* at 5:4-5.

**II.     Factual developments taken from Cruz Hernandez's Opposition.**[11]

While Cruz was in the NICU, testing ruled out infection and vascular accident as the source of seizures.  Opp'n at 4:8-9.  He was discharged with a diagnosis of post-asphyxia changes and at a high risk for neurological and developmental problems.  *Id.* at 4:8-11.  At five years of age, Cruz is a spastic quadriplegic with severe mental retardation, and is feeding tube-dependent.  *Id.* at 4:12-13.

**III.    Procedural Developments**

Hernandez sued on May 22, 2006.  *See* Docket No. 1.  She named SMC, Dr. Kahl, and Dr. Steele, as defendants.  *See id.*  On April 6, 2007, the Court issued a Case Management Schedule, setting the discovery cut off for November 16, 2007, plaintiff's expert disclosures for November 30, 2007, defendants' expert disclosures for December 14, 2007, a dispositive motion deadline for

///

---

[9]     The government indicated, without cited support, the term "occiput" refers to the posterior part of the head.  Mot at 5 n.4.

[10]    The government indicated, without cited support, the term "meconium" refers to the first intestinal discharges of the newborn infant, greenish in color.  Mot. at 5 n.5.

[11]    For the most part, the Court cannot use the facts stated in Cruz's Opposition, as he did not cite to any evidentiary sources.  *See* Docket No. 55 at 1:23-4:13.  Nor did it assist the Court for Cruz to allege the "records indicate," *id.* at 3:21, or that someone "testified in deposition that ...," *see id.* at 3:7-8, without citing to any records or transcripts, nor attaching any as exhibits.  Nonetheless, because in its Motion, the government failed to indicate Cruz's injuries, the Court had to obtain this undisputed information from one of the pleadings, in order to properly dispose of the Motion.

1  March 11, 2008, a pretrial conference for May 20, 2008, and trial for June 2, 2008.  *See* Docket

2  No. 32.

3          On October 11, 2007, the Court approved a stipulation to substitute the government for

4  Dr. Steele, because when he treated Hernandez, he was acting under a program funded under the

5  Indian Self-Determination and Education Assistance Act of 1975, ("ISDEAA"), Pub. L. No. 93-638,

6  88 Stat. 2203, Jan. 4, 1975, codified in part at 25 U.S.C. § 450 *et seq.*  Docket No. 50 ¶ 5 (Decl. of

7  Jonathan Unruh Lee ("Lee Decl.")).

8          On November 6, 2007, the Court approved a stipulation to extended the discovery cut off to

9  February 16, 2008, plaintiff's expert disclosures to February 29, 2008, defendants' expert

10 disclosures to March 14, 2008, and the dispositive motion cut off to May 6, 2008, keeping the same

11 trial date.  *See* Docket No. 38.

12         On January 30, 2008, Cruz's counsel, Stanton T. Mathews, Esq., deposed Dr. Steele.  Tr.

13 at 1.  On February 29, 2008, Mathews informed the government's counsel, Jonathan Unruh Lee,

14 Esq., he would be unable to disclose experts on time, but would provide what he could, that day.

15 Lee Decl. ¶ 7.

16         On March 3, 2008, having receiving nothing, Lee sent Mathews a fax, warning he would file

17 a motion to exclude evidence under Federal Rule of Civil Procedure 37(c)(1), unless he received

18 disclosures by the close of business.  Lee Decl., Ex. "C" at 1-2.  On March 4, 2008, having spoken

19 with Mathews, who indicated due to his own calendaring error, he failed to timely ask his experts to

20 prepare reports, Lee sent a fax to Mathews, advising he needed the disclosures and reports within

21 one to two days, in order to prepare to depose Mathews' experts.  *Id.* at 3-4.

22         On March 5, 2008, Mathews filed a motion to extend the time to disclose his experts to

23 March 14, 2008.  *See* docket No. 40.  He declared that due to health issues in Cruz's family

24 involving persons other than Cruz, his examination by his physical medicine and life care experts

25 did not occur until February 29, 2008.  *Id.* ¶ 4.  This then delayed the economist and other experts

26 who needed the physical and life-care reports for their assessments.  *Id.* ¶¶ 4-5.  Mathews said he

27 also erred in calendaring the disclosures, as he was used to the California practice of producing

28 reports well after disclosing the experts' identities.  *Id.* ¶ 7.

1    In his declaration, he stated Lee had said in his March 4 letter that the delay "is a real

2    problem. What can you do to make this right for me?" *Id.* ¶ 11. He also said Lee was refusing to

3    stipulation to mediate on March 19, 2008, even though all the parties had already agreed to do so.

4    *Id.* ¶ 14. And, he said Lee had fairly said the delay was unacceptable and impacting his case. *Id.*

5    ¶ 15.

6    On March 6, 2008, Lee sent a fax to Mathews, with a proposed stipulated order to move

7    Cruz's expert disclosures to March 14, 2007. Lee Decl., Ex. "C" at 5. He also claimed Mathews, in

8    his declaration, had misrepresented Lee's statements, and requested all future communications be in

9    writing. *Id.* This same day, Mathews responded with a fax stating he did like being called a liar in a

10   letter circulated to all the parties, and advised while the stipulation was acceptable, he would not

11   waive disclosure of rebuttal experts,[12] and inquired whether Lee would stipulate to mediation. *Id.*

12   at 10.

13   On March 7, 2008, Lee faxed Mathews a letter explaining why he took offense at his

14   declaration, including that it indicated Lee was resisting stipulating to mediation, which Lee said

15   was incorrect, as no stipulation had been proposed. *Id.* at 12. He also reiterated that defendants did

16   not feel Mathews was entitled to rebuttal experts, giving the substantial delay he had caused. *Id.* at

17   13. Lastly, Lee said he was reluctant to commit to mediation, without reviewing experts' reports.

18   *Id.* He closed by indicating there had been a breakdown of trust, which they needed to address if

19   they were to prepare pre-trial papers together. *Id.*

20   That same day, the parties filed a stipulated order extending the deadlines for Cruz's expert

21   disclosures to March 14, 2008, defendants' expert disclosures to April 4, 2008, plaintiff's rebuttal

22   expert disclosures to April 9, 2008, expert discovery to May 2, 2008, and dispositive motions to

23   May 20, 2008. *See* Docket No. 42.

24   On March 14, 2008, the parties filed a revised version of this stipulation, keeping the

25   dispositive motion deadline on May 6, 2008. *See* Docket No. 45  On March 14, 2008, Mathews

26   disclosed six experts: (1) Phillip Young, M.D., an obstetrician, who would testify regarding the

27

28   _____

[12]    This apparently alludes to conversation not documented in the evidence before the Court.

6

standard of care, treatment, liability, causation, and damages; (2) Donald Olson, M.D., a neurologist, who would testify regarding causation and damages; (3) Patricia Spier, R.N., a nurse practices expert, who would testify regarding liability for nursing care; (4) Dr. Kimberley BeDell, a physiatrics, who would testify regarding causation and damages; (5) Anne Barnes, L.P.N., a life care planning expert, who would testify regarding damages related to on-going care and treatment; and (6) Neil Lancaster, an economist, who would testify regarding damages. Lee Decl. ¶ 9; Opp'n, Ex. "1" at 4-5.

On March 19, 2008, the parties mediated, and as a result, Cruz settled with Dr. Kahl and SMC.[13]  Lee Decl. ¶ 14.  From March 21 through 29, 2008, Lee took a previously scheduled trip to visit his elderly parents in Missouri.  *Id.* ¶ 18.

The evening of Monday, March 31, 2008, Lee prepared the Motion.  *Id.*  At 8:00 a.m., on April 1, 2008, he called Mathews' office and left a voice mail to meet and confer regarding the Motion, and sent an e-mail to the same effect.  *Id.*  Lee received a message from Mathews' secretary indicating he was out, but checking messages.  *Id.* ¶ 19.  Lee called again, around noon.  *Id.* According to the secretary, Mathews had been out since the weekend sick with the flu, and had mostly lost his voice.  *Id.* ¶ 19.  Nonetheless, she said he might be able to speak later that day, and Lee gave her his cell phone number.  *Id.*  Around 4:30 p.m., Mathews called, but Lee was unavailable.  *Id.* ¶ 20.

Around 4:45 p.m., Lee called Mathews, who was not feeling well.  *Id.*  They discussed Lee's motion for partial summary judgment and his two arguments.  *Id.*  He told Mathews his first argument was "to eliminate plaintiff's claims against the hospital and Dr. Kahl from the trial because those parties had settled out and under federal authority the United States cannot be held liable for the negligence of private parties."  *Id.*  Mathews said he would take a look at the argument and get back to Lee.  *Id.*  Lee also told Mathews, "three out of four conclusions in Dr. Young's report and Dr. Olson's causation opinion were speculative and conclusory, and therefore not valid

---

[13]     According to a stipulation filed on April 24, 2008, settlement agreements and releases had been signed, and dismissals would be filed subject to the Court approving a minor's compromise. *See* Docket No. 59 at 2.

1  expert opinions." *Id.*  Again, Mathews said he would take a look at the argument and get back to

2  Lee.  *Id.*

3        That same day, the government filed the Motion.  *See* Docket No. 49.  On April 15, 2008,

4  Cruz filed his Opposition.  *See* Docket No. 55.  And, on April 22, 2008, the government filed its

5  Reply.  *See* Docket No. 56.  On April 24, 2008, the parties stipulated to extend certain deadlines, as

6  Mathews' wife had been diagnosed with a liver condition and scheduled for surgery on April 28,

7  2008, and would require hospitalization for at least three days followed by five days bed rest.  *See*

8  Docket No. 59 at 1-2.  As such, the parties extended the deadlines for discovery and pre-trial

9  documents to May 12, 2008, motions in limine to May 13, 2008, and response thereto to May 15,

10  2008.  *See id.* at 2.

11                                    **LEGAL STANDARD**

12        Summary judgment is appropriate if no genuine issue of material fact exists and the moving

13  party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*,

14  477 U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate there are

15  no genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035

16  (9th Cir. 2007).  An issue is "genuine" if the evidence is such a reasonable jury could return a

17  verdict for the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera

18  v. Philip Morris, Inc*., 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution

19  could affect an action's outcome.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

20        A movant seeking summary judgment on a matter for which the non-movant has the burden

21  of persuasion at trial, meets their burden on their motion either by producing evidence which

22  disproves an element essential to the non-movant's case, *Adickes v S.H. Kress & Co.*, 398 U.S. 144,

23  158-60 (1970); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.

24  2000), or by identifying a deficiency in the non-movant's evidence, regarding such an element, *see

25  Celotex Corp. v. Catrett*, 477 U.S. at 322-23; *Nissan*, 210 F.3d at 1102.

26        In responding to a properly supported summary judgment motion, the non-movant cannot

27  merely rely on their pleadings, but must present specific and supported material facts, of significant

28  probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith*

8

*Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine issue of material fact exists, the Court views the evidence and draws inferences in the light most favorable to the non-movant.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).  Other legal standards are discussed below as necessary.

## ANALYSIS

For the following three reasons, the Court denies the Motion.

**I.**     **The Court denies the Motion because the government failed to meet and confer in good faith, obviating the need for the Motion.**

Paragraph 5 of this Court's Standing Order for Civil Cases states, "*Meet and Confer Requirement*;  All parties are expected to meet and confer before filing any motion before this court."  This requirement is *mandatory*.  It requires a reasonable and good faith effort by the parties to meet and confer and resolve their differences, prior to using the resources of this Court and its authority to resolve their dispute.  This rule has many benefits and is supported by a number of positive public policies.  In particular, it streamlines litigation, allows the parties and the Court to use their time and resources more efficiently, and often facilitates settlement.  More importantly, *until the parties meet and confer, they do not know whether they have a genuine dispute* to bring before the Court, tying up its scarce resources.  In many cases, it will obviate the need for a motion, altogether.  As such, the requirement is not a mere formality.  Nor is it a duty the parties may take lightly.[14]

In this case, the government did not comply with the letter or spirit of the Court's Standing Order.  First, it was not reasonable or in good faith for the government to contact opposing counsel, the *same day* it intended to file its Motion.  Nor could the process provide any benefit to the parties, where Cruz's counsel was *out sick with the flu*, and as the government's counsel could tell over the

---

[14]     The Court notes some districts mandate by local rule that the parties meet and confer prior to filing a motion.  *See, e.g.*, C.D. Cal. Civ. L.R. 7-3 (parties must meet and confer at least 20 days prior to filing a motion for summary judgment).

1   phone, he was not feeling well.  Also, given the government spoke to Cruz's counsel *at 4:30 p.m.*,

2   on

3   ///

4   the day of filing, it was not possible for the parties to have a meaningful dialogue which might have

5   addressed the issues raised in the Motion.[15]

6          This is especially relevant here, where the government's primary complaint is that Cruz's

7   experts provided inadequate reports.  The government received these allegedly inadequate reports on

8   March 14, 2008.  It did not file its Motion, however, until April 1, 2008.  Even with the

9   government's counsel's pre-planned family visit, there was ample time for the parties to meet and

10  confer and resolve what, at its foundation, is merely an evidentiary or expert-discovery dispute.  It

11  was inappropriate, however, for the government to sit on the allegedly inadequate reports for more

12  than two weeks, and then wait until the last minute to engage in a pro forma meet-and-confer

13  process.

14         If, however, the government had met and conferred, and had the meetings been unsuccessful

15  from its standpoint, then it could have filed a motion to compel proper reports, under Federal Rule of

16  Civil Procedure 37.  *See* Fed. R. Civ. P. 37(a)(3)(A).  Then, had the Court granted the motion and

17  had Cruz failed to comply with its order, the government could have moved under Rule 37 to

18  exclude Cruz's experts' testimony.  *See id.* 37(b)(2)(A)(ii).  Prior to bringing the motion to compel,

19  however, the government would have had to meet and confer, possibly avoiding the need to file a

20  motion.  *See id.* 37(a)(1); Civ. L.R. 37-1.[16]  Because the government failed to make a reasonable and

21  good faith effort to do this, however, this opportunity was lost, undermining the policies supporting

22  paragraph 5 of the Court's Standing Order.  Thus, the Court denies the government's Motion

23  without prejudice, so it may meet and confer with Cruz, and if necessary, then raise any unresolved

24

25  [15]     Were it not for ECF, the government would have been hard pressed to meet and confer at
    4:30 p.m., and then file its Motion, *that same day*.

26
    [16]     Civil Local Rule 37-1(a) states, in part, "[t]he Court will not entertain a request or a motion
27  to resolve a disclosure or discovery dispute unless, pursuant to FRCivP 37, counsel have previously
    conferred for the purpose of attempting to resolve all disputed issues."  Civ. L.R. 37-1(a).  Rule 37-
28  1(b) states, in part, "[i]f a dispute arises during a discovery event the parties must attempt to resolve
    the matter without judicial intervention by conferring in good faith."  *Id.* 37-1(b).

1   issues in an appropriate manner, under the appropriate Federal Rule of Civil Procedure.

2   ///

3   ///

4   **II.      The government is not entitled to partial summary judgment (adjudication) under**

5   **Rule 56(d)(1).**

6          In the notice to its Motion, the government requested partial summary judgment under

7   Rule 56(d)(1). Mot. at 1:5-6, 6:13-19. Federal Rule of Civil Procedure 56(b) states, "[a] party

8   against whom relief is sought may move at any time, with or without supporting affidavits, for

9   summary judgment on *all or part* of the claim." Fed. R. Civ. P. 56(b) (emphasis added); *Beal Bank,*

10  *SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999); *Wang Labs., Inc. v. Mitsubishi Elec., Am., Inc.*,

11  860 F.Supp. 1448, 1450 (C.D. Cal. 1993).

12         In turn, Rule 56(d)(1) states:

13                 If summary judgment is not rendered on the whole action, the court should, to

14         the extent practicable, determine what material facts are not genuinely at issue. The

15         court should so determine by examining the pleadings and evidence before it and by

16         interrogating the attorneys. It should then issue an order specifying what

17         facts--including items of damages or other relief--are not genuinely at issue. The

18         facts so specified must be treated as established in the action.

19  Fed. R. Civ. P. 56(d)(1).

20         Although a Court may apply Rule 56(d)(1) when denying a motion for summary judgment,

21  courts have also allowed parties to move directly for a determination under Rule 56(d)(1). *Bryant v.*

22  *U.S.*, 126 F.Supp.2d 1227 (D. Ariz. 2000) (deciding law); *First Nat. Ins. Co. v. F.D.I.C.*, 977

23  F.Supp. 1051, 1055 (S.D. Cal. 1997) (deciding facts).

24         **A.      The government is not entitled to partial summary judgment, under**

25         **Rule 56(d)(1), on the issue of its liability for third-party conduct.**

26         In its Motion, the government argues under the FTCA, it cannot be held jointly and severally

27

28

liable for SMC's or Dr. Kahl's allegedly negligent conduct,[17] Mot. at 6:21-8:4, 11:21-12:2; Reply at 3:24-4:2, and thus the Court should grant it partial summary judgment on this issue, *id.* at 14:4-5. In addition, the government notes the third and fourth conclusions of Dr. Young's report only address Dr. Kahl's or SMC's conduct, and Nurse Spier's report only addresses nursing care.  *Id.* at 12:5-9.  Thus, the government argues, as the FTCA bars Cruz from going to trial on any theory of government liability which rests on these expert opinions, *id.* at 11:18-20, Cruz should either withdraw them, or the Court should strike them, *id.* at 14:5-6.  The Court addresses each of these arguments, in turn.

### 1.    Joint and Several Liability under the FTCA and California Law

In his Opposition, Cruz argues Dr. Kahl's and SMC's liability is relevant for apportioning each defendant's liability under California's Proposition 51.[18]  Opp'n at 1:8-11.

The Court agrees with Cruz.  In *Taylor v. U.S.*, 821 F.2d 1428 (9th Cir. 1987), the Ninth Circuit held that section 3333.2 of the California Civil Code, which caps non-economic damages in medical malpractice suits at $250,000, applied in suits under the FTCA.[19]  *Id.* at 1430.  In so holding, the Court noted, the FTCA provides:

> the government "shall be liable ... in the same manner and to the same extent as a

---

[17]    In his Opposition, Cruz argued with regards to the United States, he had never alleged or claimed an agency or employment relationship between it and Dr. Kahl or SMC.  Opp'n at 1:3-6. He also argued their individual liability stood on its own, and these two defendants had settled and would not raise an agency defense.  *Id.* at 1:6-8.  In response, the government noted Cruz had alleged in his Complaint that all defendants were agents, partners, *et seq.* of or with each other. Reply at 3:9-18.  The Court notes the government appears to have raised an unresolved factual dispute which bars partial summary judgment on the grounds the government is not liable for the conduct of SMC or Dr. Kahl.  In this regard, the Court also notes this matter's docket indicates the United States Attorney's Office represents all defendants as counsel or co-counsel.  Regardless, had the government met-and-conferred as required by the Court's Standing Order and Rule 37, it appears this dispute could have been easily "stipulated" away.  At any rate, because the Court is denying the government's motion on other grounds, and because the parties have not properly briefed the alleged agency issue, the Court does not reach it.

[18]    This voter initiative was codified, in pertinent part, in section 1431.2 of the California Civil Code, discussed *infra*.  *See Evangelatos v. Super. Ct.*, 44 Cal.3d 1188, 1192, 246 Cal.Rptr. 629, 753 P.2d 585 (1988).

[19]    The government appears to concede this implicitly, by mentioning section 3333.2 in a footnote addressing its discussion of the elements of a medical malpractice action under California law.  *See* Mot. at 8 n.6.

1    private individual under like circumstances...."  28 U.S.C. § 2674.  Liability is to be

2    determined "in accordance with the law of the place where the [negligent] act or

3    omission occurred."  28 U.S.C. § 1346.  In this case, the negligent act occurred in

4  ///

5    California.  Accordingly, California law determines the nature and extent of the

6    government's liability for Taylor's injuries.

7  *Taylor*, 821 F.2d at 1430.

8    Likewise, the Ninth Circuit has held, "[t]he components and measure of damages in FTCA

9  claims are taken from the state where the tort occurred ...."  *Shaw v. United States*, 741 F.2d 1202,

10  1205 (9th Cir. 1984).  In this regard, the Ninth Circuit has also applied sections 1431 and 1431.2 of

11  the California Code of Civil Procedure in suits under the FTCA.  As the court noted in *In re Air*

12  *Crash Disaster Near Cerritos, Cal., On Aug. 31, 1986*, 982 F.2d 1271 (9th Cir. 1992),

13  "[s]ection 1431 provides in relevant part that:  'an obligation imposed upon several persons ... is

14  presumed to be joint, and not several, except as provided in Section 1431.2....' "  *In re Air Crash*,

15  982 F.2d at 1275 n.4.  The court further noted:

16    Section 1431.2(a) provides:  In any action for personal injury, property damage, or

17    wrongful death, based upon principles of comparative fault, the liability of each

18    defendant for non-economic damages shall be several only and shall not be joint.

19    Each defendant shall be liable only for the amount of non-economic damages

20    allocated to that defendant in direct proportion to that defendant's percentage of fault,

21    and a separate judgment shall be rendered against that defendant for that amount.

22  *In re Air Crash*, 982 F.2d at 1275 n.4.

23    Based on these holdings, this Court concludes were it[20] to find the government and any other

24  defendant liable, the Court would then have to determine economic and non-economic damages, as

25  well as the liable defendants' comparative fault.  The government would then be jointly liable for

26  economic damages, under section 1431, but only severally liable for non-economic damages, under

27

28  ─────────────────────
   [20]    Under 28 U.S.C. § 2402, actions involving the United States are not tried to a jury.

section 1431.2, with the latter capped at $250,000, under section 3333.2.  As such, the Court would

need to hear and receive evidence regarding each defendant's actions, including expert medical

testimony as to how Cruz's damages were causally linked to each defendant's actions.  Thus, the

///

Court denies the government's motion for partial summary judgment on the issue of its liability

based on SMC's or Dr. Kahl's conduct.

### 2.      Striking expert opinion directed at actors other than Dr. Steele.

As for the government's request that the Court strike portions of Cruz's experts' reports

which do not address Dr. Steele, the Court denies it for two reasons.  First, as just discussed, the

Court may need to consider expert opinions regarding the actions of persons other than Dr. Steele, in

order to apportion several liability for non-economic damages.  Second, Rule 56(d)(1) does not

provide a "strike" remedy.  This rule allows the Court to make findings of uncontested fact or law,

which *removes them from dispute* at trial, but does not provide for striking evidence, thus *removing*

*it from the pool of evidence admissible at trial*.  Thus, the Court denies the government's request,

under Rule 56(d)(1), to strike the third and fourth conclusions of Dr. Young's report because it only

addresses Dr. Kahl's or SMC's conduct, or Nurse Spier's report because it only addresses nursing

care.

### 3.      The discretionary nature of the Court's review under Rule 56(d)(1).

Rule 56(d)(1) is phrased in terms of what a court "should" do, because a court may grant

partial summary judgment under Rule 56(d)(1), in its discretion.  Fed. R. Civ. P. 56(d)(1); 10B

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice & Proc.* § 2737 (1998)

(discussing prior Rule 56(d)).  Further, the purpose of exercising this discretion is to expedite

litigation by streamlining matters for trial.  Miller, *et al.*, *supra*, § 2737.  In this case, however, even

were partial summary adjudication available, the Court is unpersuaded exercising its discretion

would yield any benefit.

First, Rule 56(d)(1) requires a court to "examin[e] the pleadings and evidence before it and

interrogat[e] the attorneys."  Fed. R. Civ. P. 56(d)(1).  Here, this would have been difficult because

when the Motion was set for hearing, discovery was still open, Docket No. 45, and expert

depositions had not been taken, Docket No. 57 ¶¶ 22-30.[21]  Second, in a relatively straightforward medical malpractice case, with only one defendant left, it is unclear what efficiencies would result from such a hearing.   Third, to the extent the government seeks to "lock in" some of Cruz's experts' opinions, this would deprive the Court of in-court examination on these issues, which might prove more valuable, than merely considering static reports.[22]

While there may be cases with *distinct* multiple claims, damage categories, or causal paths, where it might be efficient for a defendant to seek partial summary judgment, to negate its liability for the acts of other defendants, this is not one of them.  Thus, under the circumstances presented here, the Court is unpersuaded it should exercise its discretion to grant partial summary judgement.

**B.**      **The government is not entitled to partial summary judgment, under**

**Rule 56(d)(1), on the issue of the adequacy of Cruz's experts' opinions.**

In its Motion, the government argues Drs. Olson and Young provided very short reports that did not set forth valid expert opinions.  Mot. at 14:7-8.  Specifically, it argues Dr. Young's first, third, and fourth opinions are allegedly vague, speculative, uncertain, and conclusory and thus cannot create a triable issue of fact.  *Id.* at 14:9-11.  As for Dr. Olson's opinion about causation, the government claims it is allegedly vague, speculative, and uncertain, and thus cannot create a triable issue of fact.  *Id.* at 14:8-9.  Thus, the government requests Cruz either withdraw the reports or the Court strike them.  *Id.* at 14:11.

**1.**      **The government's Rule 26 and *Daubert* arguments.**

The government puts forth two arguments for its strike request.  One argument is based on Federal Rule of Civil Procedure 26 and the other is based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  With regards to both arguments, the government notes

---

[21]      In this regard, the Court notes, although the government claims Cruz's expert reports are defective, certain types of alleged defects may be curable in these experts' depositions.

[22]      Further, if the government merely wished to "lock in" Cruz's experts' opinions, regarding the defendants who have settled, it could have sought a stipulation from Cruz, rather than filed its Motion.  This is one reason the Court has a mandatory meet-and-confer requirement.

the elements of a medical malpractice claim[23] may only be proven by expert testimony, unless the conduct at issue is within the common knowledge of laypersons.  Mot. at 8:14-18.  *Hutchinson v. U.S.*, 838 F.2d 390, 392-93, 392 n.1 (9th Cir. 1988).[24]  Then, turning to its first argument, the government notes under Rule 26(a)(2)(B), an expert must provide a written report, including a "complete statement of all opinions to be expressed and the basis and reasons for them."[25]  Mot. at 8:20-9:2.  These reports, the government observes, must be detailed and complete, not "sketchy and vague," and ideally will obviate the need for expert depositions.  Mot. at 9:24-10:4 (citing Fed. R. Civ. P. 26 advisory committee's 1993 note).  Further, it notes a failure to properly disclose under Rule 26(a)(2)(B) can result in sanctions under Rule 37(c)(1).[26]  Mot. at 10:4-6 (citing *Yeti By Molly,*

---

[23]    These elements are:
(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.
*Hanson v. Grode*, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999) (quoting *Gami v. Mullikin Med. Ctr.*, 18 Cal.App.4th 870, 877, 22 Cal.Rptr.2d 819 (1993) (quoting *Budd v. Nixen*, 6 Cal.3d 195, 200, 98 Cal.Rptr. 849, 491 P.2d 433 (1971))); Mot. at 8:9-13.

[24]    The government cites California cases for this principle, Mot. at 14-19, but the need or not for expert testimony turns on the Federal Rules of Evidence.  See Fed. R. Evid. 701-02.  In *Hutchinson*, however, the Ninth Circuit adopted California holdings expressing this principle, for use in cases involving California's substantive medical malpractice law.

[25]    Federal Rule of Civil Procedure 26(a)(2)(B) states:
(B) Written Report.  Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
(i) a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii) the data or other information considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

[26]    Federal Rule of Civil Procedure 37(c)(1) states, in part, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

1    *Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

2    ///

3    ///

4    ///

5    ///

6          Turning to its second argument, the government notes Federal Rule of Evidence 702,[27] which

7    determines when a court should admit expert testimony, was amended in 2000, in response to

8    *Daubert*.  Mot. at 8:19-20.  *Daubert*, as the government notes, held a court is the gatekeeper of

9    expert testimony.  Mot at 9:2-6.  That is, "[f]aced with a proffer of expert scientific testimony ... the

10   trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to

11   testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a

12   fact in issue."  Mot. at 9:3-6 (quoting *Daubert*, 509 U.S. at 592).

13         The government argues this "gatekeeper responsibility requires the trial judge to assess the

14   reasoning and methodology underlying the expert's opinion, asking whether the expert is competent

15   to testify to the opinion, and whether the opinion has a reliable basis in the knowledge and

16   experience of the expert's discipline."  Mot. at 9:6-9.  It also argues a court should apply *Daubert*'s

17   five non-exclusive factors to determine whether an expert's theory or technique:  (1) can be or has

18   been tested; (2) has been subject to peer review and publication; (3) has a known or potential rate of

19   error; (4) is governed by standards controlling its operation; and (5) is generally accepted within the

20   relevant scientific community.  Mot. at 9:10-14 (citing *Daubert*, 509 U.S. at 592-94).

21         The government thus concludes, if a court finds an expert's report is inadmissible under

22   *Daubert*'s factors, then summary judgment is appropriate, as the proponent will have failed to meet

23   their burden to demonstrate admissibility under Rule 104(a).  Mot. at 10:7-11.  Thus, for example,

24

25   [27]    Federal Rule of Evidence 702 states:
                 If scientific, technical, or other specialized knowledge will assist the trier of
26          fact to understand the evidence or to determine a fact in issue, a witness qualified as
            an expert by knowledge, skill, experience, training, or education, may testify thereto
27          in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
            facts or data, (2) the testimony is the product of reliable principles and methods, and
28          (3) the witness has applied the principles and methods reliably to the facts of the case.

1   the government notes, an expert's opinion would be inadmissible under Rule 702 and *Daubert* when

2   based on a naked conclusion, guess work, or unsupported facts.  Mot. at 10:12-21 (citing *Porter v.*

3   *Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993) (doctor admitted she provided an opinion

4   unsupported by any research)).   Lastly, the government argues a non-movant may not cure their

5   *Daubert*-defective expert evidence, once a motion for partial summary judgment has been submitted

6   to a court.  Mot. at 11:7-10 (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir.

7   2001)).[28]

8                        **2.       Dr. Young's Opinion**

9           With regards to Dr. Young, the government objects to his first conclusion, which states:

10                  The baby should have been delivered by cesarean section at or about

11          1645 hours on 10/11/02 due to failure to progress in labor between the hours of 1230

12          and 1645 (see OB flow sheet, Bates #000128) there is no evidence in the chart that

13          this was offered or discussed.  At that time there is no evidence that the baby was in

14          any way affected by hypoxia; the strip is benign.  This indication continued through

15          1900 hours.

16   Docket No. 50, Ex. "D" (Young Report).

17           The government argues, "[t]his paragraph asserts that during the time when there was no

18   evidence of any hypoxia, the baby should have been delivered by cesarean.  This rather remarkable

19   claim has no basis in evidence or fact....  Dr. Young's report does not meet the criteria for a valid

20   expert conclusion."  Mot. at 13:4-8.

21           In opposition, Cruz first notes in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999),

22   the Supreme Court noted *Daubert*'s flexibility, holding district court's had as much latitude in *how*

23   they determined reliability, as it did in ultimately determining it.  *Id.* at 141-42.  As such, the court

24   held trial courts could use one or more *Daubert* factors if they helped determine reliability, but need

25

26   ───────────────

27   [28]     As *Daubert* is inapplicable to Cruz's experts' opinions, the Court does not reach this issue.
     Nonetheless, the Court notes *Nelson* did not address *partial* summary judgments, which are not
     dispositive judgments, but interlocutory orders subject to modification at any time prior to final

28   judgment.  Nor did it address a situation where a movant essentially repackages its Rule 37 motion
     as a Rule 56 motion, but fails to satisfy the meet and confer requirements.

1   not use all or any of them in every case.  *Id.* at 141.

2          Cruz then points to *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1778 (9th Cir. 2007), where a

3   sociologist presented expert evidence about Wal-Mart's alleged discriminatory practices, derived by

4   using a "social framework analysis" methodology.  Opp'n at 8:17-9:12.  Wal-Mart argued the

5   expert's conclusions were vague and imprecise and failed to meet the standards for expert testimony

6   established by Rule 702 and *Daubert*.  *Id.* at 1179.  The Ninth Circuit held Wal-Mart was not

7   challenging the expert's methodology or relevance, but only "whether certain inferences can be

8   persuasively drawn from his data."  *Id.*  It further held, because *Daubert* does not allow a court to

9   admit or exclude evidence based on its persuasiveness, but only based on its scientific reliability and

10  relevance, a *Daubert* analysis would do Wal-Mart no good.  *Id.*

11         Cruz then argues the government has made the same allegations about Dr. Young's opinion

12  that Wal-Mart made about the expert's opinion in *Dukes*.  Opp'n at 8:15-17, 9:2-5, 9:13-17.

13  Specifically, Cruz argues his experts are "relying primarily on their experience and skill as medical

14  professionals, rather than on any specific scientific experiments."  *Id.* at 8:14-15.  Further, he argues

15  "properly analyzed medical data, like that offered by Dr. Young and Dr. Olson, may certainly add

16  probative value to [Cruz's] claims."  *Id.* at 9:15-17.

17         The Court, after considering the arguments of both parties, agrees with Cruz.  With regards

18  to the government's Rule 26 argument, this rule has seven requirements for experts' reports,[29] but

19  the government's only objects to Dr. Young's first conclusion on the grounds it has "no basis in

20  evidence or fact."[30]  The government, however, does not question Dr. Young's medical knowledge,

21  background, experience, or competency to render a qualified medical opinion.

22         The Court notes Dr. Young reviewed fetal monitoring strips, Dr. Kahl's deposition,

23  Dr. Steele's deposition, and SMC medical records.  Young Rpt. at 1.  He consulted with Dr. Olson.

24

25  _____

    [29]     *See supra* note 25.

26
    [30]     The government also alleged it was a "remarkable claim" for Dr. Young to opine "when
27  there was no evidence of any hypoxia, the baby should have been delivered by cesarean."  If the
    government wished to argue a cesarean is only required when a baby exhibits hypoxia, then it should
28  have provided an expert medical opinion to this effect.  Otherwise, the Court cannot determine
    whether or not Dr. Young's claim is "remarkable."

                                                    19

1   *Id.*  Then, based on his review he concluded Cruz should have been delivered by cesarean at or

2   about 1645 hours "due to a failure to progress in labor between the hours of 1230 and 1645 ...."  *Id.*

3   And, for support, he referenced Bates page 000128 in the "OB flow sheet."  *Id.*

4         The Court further notes Hernandez was admitted at 11:30 p.m., on October 9.  Thus,

5   Dr. Young appears to opine that by 4:45 p.m., *the next day*, having not progressed in labor since

6   12:30 p.m., it was time for a cesarean delivery.  The Court also notes, he presented sufficient

7   information for the government's expert to take a counter-position, if possible, and for the

8   government to take his deposition.[31]  As the movant, the government has the burden to show what

9   evidentiary or factual basis Dr. Young's opinion was lacking.  It fails to do this, however, and as

10  Cruz notes, it thus fails to meet its burden for its Motion.  *See* Opp'n at 20-25.

11        Turning to the government's *Daubert* argument, Cruz correctly argues there is no evidence

12  before the Court to suggest Dr. Young's opinion was based on a flawed or untested methodology.

13  Nor is there any evidence to suggest his opinion is irrelevant, as the government concedes it clearly

14  addresses the standard of care provided to Hernandez.  Thus, as with Wal-Mart in *Dukes*, *Daubert*

15  will not help the government here.[32]  Based on the foregoing, the Court denies partial summary

16  judgment for the government, with respect to Dr. Young's first conclusion.

### 3. Dr. Olson's Opinion

18        With regards to Dr. Olson's opinion, the government first claims he is Cruz's sole expert on

19  causation.  Mot. at 13:9.  The Court notes the disclosure materials indicate Drs. Young, Bell, and

20  Olson will all testify regarding causation.  Second, the government argues:

21      Dr. Olson's report states that Cruz Hernandez suffered a hypoxic ischemic brain

22      insult before the time of his birth.  *See* Report at 2.  Dr. Olson then goes on to state

23      that "it is likely that the insult occurred on the day of delivery, beginning shortly

24      before the fetal heart tracing showed late decelerations at 19:03.  The radiological

---

26  [31]      Thus, the government incorrectly argued in its Reply that an opinion such as Dr. Young's allows for "trial by ambush."  Reply at 5:3-5.

27  [32]      Frankly, the government could have and should have dropped the entire *Daubert* argument
28  from its Motion, as it has no relevance here at all, and the government's objections clearly revolve solely around Rule 26(a)(2)(B), and not *Daubert*.

1    findings are also consistent with an insult occurring in this day, prior to delivery,

2    though the imaging does not provide a precise time."

3 Mot. at 13:9-14.

4        The government then argues, "[t]hese statements are mere speculation.  Dr. Olson's claim

5 that an injury "likely" occurred on the day of delivery is not an expert opinion under Rule 26."  Mot.

6 at 13:15-17.  In its Reply, the government further argues his statements were speculative as they did

7 not describe the basis for his conclusions nor the standards applicable to them.  Reply at 5:6-9.  "It is

8 simply Dr. Olson's considered judgment, without reference to any specific evidence or authority."[33]

9 *Id.* at 5:9-10.

10       In Opposition, Cruz raises the same arguments he did in defending Dr. Young's opinion,

11 Opp'n at 8:15-17, 9:2-5, 9:13-17, but also adds the government failed to fully quote Dr. Olson.  *Id.*

12 at 10:13-16.  Dr. Olson actually said, "[i]n summary, to a *reasonable medical probability*, Cruz has

13 severe neurological problems attributable to a hypoxic ischemic brain insult occurring before the

14 time of birth.  It is likely that the insult occurred on the day of delivery ..."  Docket No. 50, Ex. "E"

15 (Olson Report) (emphasis added).

16       The Court, having considered the parties' arguments, again sides with Cruz.  Turning to the

17 government's Rule 26 argument, it raises two issues.  First, it claims the term "likely" was

18 speculative.  As Cruz noted, Dr. Olson uses the term "reasonable medical probability."  Further, the

19 Court notes the government provided no legal authority or explanation as to why "likely" is

20 inherently speculative in the context of an expert medical report.  Cruz has a preponderant standard

21 of proof, and Dr. Olson has helped him meet it.  Thus, the Court finds the government's first

22 argument unpersuasive.

23       For its second argument, the government claims Dr. Olson did not describe the basis for his

24 conclusions nor their applicable standards, but just presented his judgment, without reference to any

25 specific evidence or authority.  The Court first notes the government has not questioned Dr. Olson's

26

27 _____

28 [33]     The Court notes it is unclear what the government finds lacking here, as experts are expected to provided opinions based on their expertise, which they reach by using their "considered judgment."

medical knowledge, background, experience, or competency to render a qualified medical opinion. Nor has it presented any legal argument that Dr. Olson may not rely on the same to express an expert opinion.

With regards to the issue of "basis" or "evidence," Dr. Olson states he reviewed Hernandez's medical records from SMC, including her fetal strips; Cruz's medical records from SMC, Occidental Health Center, and UCSF; and, a deposition of a Dr. Janian;[34] and he consulted with Dr. Young and Patrick Barnes, M.D., a neuroradiologist.  Olson Rpt. at 1.  Further, in his report, he provides a 12-line summary of the factual data surrounding Cruz's birth.  As the movant, the government has the burden to explain or show what standards or bases Dr. Olson's opinions are lacking.  It fails to do this, however, and as Cruz notes, it thus fails to meet its burden for its Motion.  *See* Opp'n at 20-25.

With regards to the government's *Daubert* argument, there is no evidence before the Court to suggest Dr. Olson's opinion is based on a flawed or untested methodology.  Nor is there any evidence to suggest his opinion is irrelevant, as he provided a causal link to a reasonable medical certainty between Cruz's injuries and the events during his delivery.  Thus, just as with Dr. Young, *Daubert* will not help the government here.[35]  Based on the foregoing, the Court denies the government's motion for partial summary judgment with regards to Dr. Olson's report.

### 4. The government may not repackage a Rule 37 motion or a motion in limine as a Rule 56 motion.

In arguing Dr. Young's and Dr. Olson's reports are inadequate under Rule 26(a)(2)(B), the government cites to *Yeti By Molly, Ltd.*, 259 F.3d at 1106, for the proposition that a failure to properly disclose under this rule could result in exclusionary sanctions under Rule 37(c)(1).  Mot. at 10:4-6.  This observation, coupled with the complete surplusage of the government's *Daubert* argument, highlights that the real issue before the Court is whether or not Cruz produced expert

---

[34] The parties do not indicate who this is.

[35] In its Reply, the government argues because Dr. Olson's report does not comply with Rule 26(a)(2)(B), the Court cannot analyze it under *Daubert*.  Reply at 5:10-12.  While there could be cases were this might be true, generally, as in this case, the two issues are completely separate from one another, with Rule 26 implicated far more often than *Daubert* is.

22

1    reports as required under Rule 26(a)(2)(B); and, not whether the government is entitled to partial

2    summary judgment in regards to these reports.  This is why the government asks the Court to *strike*

3    these reports or parts thereof.  The Court reiterates what it discussed in part I *supra*, and holds the

4    government may not repackage a Rule 37 motion for sanctions, or a motion in limine, as a Rule 56

5    motion for partial summary judgment.

6    ///

7    **III.    A reply is not the proper vehicle for raising a discovery dispute with the Court.**

8           At the end of its Reply, the government states, "Rule 26 experts must be made available for

9    their deposition.  For failure to produce Dr. Olson for deposition, Dr. Olson's report should be

10   stricken in its entirety."  Reply at 5:14-15.  First, a reply is solely used to reply to issues raised in an

11   opposition to a motion.  A reply is not a vehicle for raising new issues, unless they are new factual

12   or legal developments which impact the initial motion.  Second, when one party has a discovery

13   dispute with another party, Rule 37 provides the proper course of action to take.  If the government

14   has a discovery dispute with Cruz, it should turn to Rule 37 and Civil Local Rule 37.  It should not

15   tack it onto the end of its Reply.  Not only is the Court unable to consider what is at best an ex parte

16   request to strike evidence, but as the government filed it on April 22, 2008, the Court cannot but

17   wonder if instead of trying to resolve the issue, the government has done nothing, since that time.  In

18   conclusion, the Court denies the government's request.

19   **IV.    There are no grounds on which to grant Cruz's Motion for Leave.**

20          On May 1, 2008, Cruz filed his Motion to Leave, alleging the government had raised the

21   following three issues, for the first time, in its Reply:  (1) The issue of joint and several liability;

22   Mot. for Leave ¶ 7.a; (2) The allegation there is "no standard of care or authority for any standard of

23   care cited-other than the *ipse dixit* of Dr. Young[,]" *id.* ¶ 7.b; and (3) The government's request to

24   strike Dr. Olson's report, *id.* ¶ 7.c.  With regards to the first issue, the government raises it in its

25   Motion, though not by the express terms "joint and several liability," and Cruz addresses it in his

26   Opposition, even discussing the relationship between the non-economic damage caps of California

27   Civil Code section 3333.2 and the FTCA.  As for the second issue, the government does not

28   distinguish Dr. Young's opinions as either addressing the applicable standard of care or causation,

1    but clearly attacks them as vague, speculative, uncertain, and conclusory.  And, Cruz responded to

2    these allegations in his Opposition.  As for the third issue, the Court denied the government's

3    request to strike Dr. Olson's report.  Thus, there is no basis for allowing Cruz to supplement any of

4    these three issues.

5    ///

6    ///

7                                           **CONCLUSION**

8           Accordingly, the Court DENIES without prejudice defendant United States of America's

9    Motion for Partial Summary Judgment [Docket No. 49], with leave to later re-file a motion under

10   Rule 37 or a motion in limine, if it needs to.  In addition, the Court DENIES without prejudice

11   defendant United States of America's request in its Reply Memorandum regarding the Motion

12   [Docket No. 56] to strike Dr. Olson's report.  And, lastly, the Court DENIES plaintiff's Motion for

13   Leave to File Sur-Reply in Response to Defendant, U.S. Partial MSJ [Docket No. 63].

14

15          IT IS SO ORDERED.

16
     May 20, 2008                    _____
17                                   Saundra Brown Armstrong
18                                   United States District Judge

19

20

21

22

23

24

25

26

27

28

24