UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| CRUZ HERNANDEZ, a minor, by and through his Guardian ad Litem, Alicia Telles-Hernandez,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No:  C  06-3350 SBA<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## **FINDINGS OF FACT**

**A.    PRENATAL COURSE BEFORE RUPTURE OF MEMBRANES**

1.    Alicia Telles-Hernandez learned she was pregnant in March 2002.  Reporter's Transcript (RT) 360:12-16.  She received prenatal care from her primary physician, Dr. Don Carlos Steele (hereinafter Dr. Steele or Defendant) at the Sonoma County Indian Health Project.  RT 359:19-360:10.[1]

2.    The Sonoma County Indian Health Project (SCIHP) is a nonprofit corporation providing health care to Native Americans in the Northern California area, which does not have an Indian Health Service hospital.  RT 582:2-13. SCIHP provides medical, pharmaceutical, dental, and behavioral health care services.  RT 582:14-21. SCIHP serves an under-represented population because the ratio of population to physicians is much greater among Native Americans than other groups.  RT 582:23-583:11.

---

[1] By stipulation of the parties, the United States was substituted in place of Dr. Steele as a party-defendant.  However, further references to "Defendant" are intended to refer to Dr. Steele.

3.      Dr. Steele is a family physician who, following his education at Dartmouth Medical School and residency at the Oregon Health Sciences University, became licensed to practice medicine in California in the early 1990s.  He began his family practice at Sonoma County Indian Health Clinic Project in 1993.  RT 576:22 581:24. At the time of the events at issue, he had privileges at Sutter Santa Rosa Medical Center, including obstetrical privileges.  RT 577:21-22. He had privileges to assist at surgery but not operate as the primary surgeon.  RT 811:4-11.  In approximately April 2002, Mrs. Telles-Hernandez had an urinary tract infection, which Dr. Steele treated with antibiotics.  RT 585:11-587:1.

4.      During her last trimester, Mrs. Telles-Hernandez had a mildly elevated blood pressure, which Dr. Steele reviewed and assessed, and which presented no further problem.  RT 587:2-25.

**B.      EVENTS OF OCTOBER 9-10, 2002**

5.      At approximately 10:00 to 11:00 p.m. on October 9, 2002, Mrs. Telles-Hernandez arrived at Sutter Santa Rosa Medical Center, reporting that her membranes had ruptured a couple of hours earlier.  RT 588:7-13.  When she arrived at the hospital, she was in the latent phase of labor, meaning her cervical dilation was less than four centimeters.  RT 589:18-590:10.

6.      Mrs. Telles-Hernandez strongly desired to have a vaginal delivery.  However, there were four factors present at the time of her admission to the hospital that militated against the likelihood that she would be able to deliver her baby in that manner:  (1) she was only eighteen years-old, which is a certified American College of OB/GYN (ACOG) risk factor; (2) she was of an under-served population that has more complications in labor than the ordinary population; (3) she was 5'1" tall and weighed 212 pounds, making it more likely that she would have a small pelvis combined with a larger baby; and (4) she presented at minus-two station, whereas a Primip (a female during her first pregnancy) at term with ruptured membranes should be at least zero station, meaning that the fetus' head should be level with the mid-pelvis and no centimeters above it.  RT 82:10–83:13.

7.      At approximately 11:00 p.m. on October 9, 2002, Dr. Steele wrote a chart note called "admit note," which was received in evidence. Def's. Exh. B at 000082; RT 595:5-597:1.

The admit note documented Dr. Steele's initial examination of Mrs. Telles-Hernandez on that evening, noting that her status was irregular, she had sporadic uterine contractions with 1.5 centimeters dilation, and there was spontaneous rupture of membranes (SROM).  RT 597:10-600:21.

8.      In the morning of October 10, 2002, Mrs. Telles-Hernandez was started on Pitocin, a drug intended to induce labor; however, over the course of the day, the induction failed.  RT 86:22-25.

9.      Around noon on October 10, 2002, Dr. Steele prescribed prophylactic antibiotics to Mrs. Telles-Hernandez intended to prevent infection.  RT 500:15-21, 594:6-15.  Dr. Kahl confirmed this.  RT 755:16-19. The standard of care for prescribing prophylactic antibiotics is usually 12 hours after the membranes have ruptured.  RT 594:6-11.

10.      Dr. Steele continued to monitor Mrs. Telles-Hernandez throughout the day on October 10, 2002.  He documented this in his note summarizing the events of the day, which was received into evidence. Def's. Exh. B at 000084; RT 623:7-25.

C.      **EVENTS OF OCTOBER 11, 2002 UNTIL 3:00 P.M.**

11.      Dr. Steele spent the night of October 10-11 at the hospital.  RT 593:1-3.  Early on the morning of October 11th, Dr. Steele wrote a summary note, which was received into evidence. Exh. B at 00084; RT 623:7-25.

12.      In this record, Dr. Steele noted that there had been no real change in Mrs. Telles-Hernandez' progress since the previous note, her cervical dilation was now at 3 centimeters and his plan was to place internal monitoring equipment and continue with Pitocin.  RT 606:6-607:22. The internal equipment included the intrauterine pressure catheter (IUPC) to measure uterine contractions and the fetal scalp electrode, which measures uterine contractions and fetal heart tones simultaneously, but through separate electrodes.  RT 607:23-609:1.

13.      At about 12:00 p.m. on October 11, 2002, Dr. Steele asked Natasha Kahl, M.D., for a consult regarding Mrs. Telles-Hernandez' blood pressure readings during the labor course.  RT 685:3-12.  Dr. Kahl has been an obstetrician and gynecologist, with surgical privileges and practicing at Sutter Santa Rosa Medical Center since September 1999.  RT 682:11-25.

14.     This first consultation was to check on Dr. Steele's concern Mrs. Telles-Hernandez' potential for preeclampsia, which is a condition peculiar to pregnancy involving elevated blood pressures, the spillage of urine protein, and often other end organ problems such as liver or kidney problems.  RT 685:13-686:1.

15.     Dr. Kahl came to the hospital, reviewed Mrs. Telles-Hernandez' medical records, met with her, performed a physical assessment and documented her opinions.  RT 686:2-8.  The assessment included an examination of Mrs. Telles-Hernandez' abdomen and review of the fetal heart rate tracing and uterine activity.  RT 686:8-687:18.  Dr. Kahl determined that Mrs. Telles-Hernandez did not have abdominal pain and that her uterus was relaxing between contractions, despite an elevated uterine pressure shown on the monitor.  RT 687:19-690:10.

16.     At 10:15 a.m., Mrs. Telles-Hernandez was 3 centimeters dialated and 5 centimeters dilated at 12:30 p.m., thus indicating that she had entered the "active" phase of labor (4 centimeters or greater).  RT 591:13-592:9.  However, Dr. Kahl reported that Mrs. Telles-Hernandez was not in active labor at the time of her first consultation which occurred "midday."  RT 685:10, 690:15-16.

17.     At 1:00 p.m. on October 11, 2002, Dr. Steele entered a note in the medical chart, which was received into evidence.  Def.'s Exh. B at 000093; RT 623:7-25.  This note indicated that Mrs. Telles-Hernandez' lab work regarding the possible preeclampsia had checked out as normal and she was making slow progress in labor with Pitocin, with cervical dilation at 5 centimeters. RT 609:9-614:22.

18.     From 12:30 p.m. to 4:30 p.m., Mrs. Telles-Hernandez' uterine contractions were "mild" with only one recorded entry in the nursing chart that reached the normal level of 60 millimeters of mercury.  RT 803:22-805:9.

**D.   EVENTS OF OCTOBER 11, 2002 FROM 3:00 P.M. TO 7:00 P.M.**

19.     Nurse Catherine Clark was a labor and delivery nurse working at Sutter Santa Rosa Medical Center on October 11, 2002.  RT 508:6-8.  Her shift started at 3:00 p.m. and she was assigned to manage the labor and delivery of Mrs. Telles-Hernandez.  RT 508:9-23.

20.     As the labor and delivery nurse assigned to Mrs. Telles-Hernandez, Ms. Clark reviewed the fetal heart tracing between 3:00 p.m. and 8:30 p.m.  RT 519:20-24.  She testified that

1    the heart rate showed good variability throughout the entire time.   RT 519:25-520:9.  She noted

2    "there was nothing we were concerned about in terms of the fetal heart rate on this baby in terms of

3    variability."  RT 520:8-9.

4        21.    Ms. Clark palpated Mrs. Telles-Hernandez' uterus between 3:00 and 8:30 p.m.  RT

5    520:24-521:6.  Her observations of the uterine contractions during that time period were not

6    consistent with the uterus being in constant contraction without relaxation.  RT 521:7-12.  On

7    cross-examination, Ms. Clark explained that due to problems with the monitoring equipment and

8    Mrs. Telles-Hernandez' body position at different points, the tracing of uterine contractions was

9    inaccurate.   RT 549:10-555:15.  On redirect, Ms. Clark noted the specific times – 5:00 p.m. and

10   6:05 p.m., when the monitoring equipment was changed due to inaccurate or difficult readings.  RT

11   566:16-567:24. Dr. Steele confirmed this.  RT 807:23-24, 809:7-18.

12       22.    Ms. Clark testified that at 3:45 p.m. she recorded Mrs. Telles-Hernandez'

13   temperature as 100 degrees.  RT 523:6-19. At that time, she recorded fetal heart tone as "130s,"

14   variability as "moderate," and uterine contractions as 25-35 millimeters of mercury.  RT 524:5-12;

15   Def.'s Exh. 3 at 000128.

16       23.    Ms. Clark documented maternal temperature, fetal heart tone, variability,

17   accelerations, and uterine contractions throughout the rest of her shift that day.  Def.'s Ex. 3 at

18   000135 (documenting the period from 5:45 p.m. to 9:00 p.m); RT 525:13-526:13.  Ms. Clark

19   recorded a normal maternal temperature of 98.4 degrees at 6:45 p.m.  RT 526:13-20.  She recorded

20   fetal heart tones of 140s and 130s during this period.  RT 526:22-24.  She documented that fetal

21   heart rate variability was moderate and accelerations were present.  RT 527:1-11. She also recorded

22   variable heart rate decelerations at 6:00 p.m. and 8:30 p.m., but did not record late decelerations

23   during the period.  RT 527:13-528:11.

24       24.    Ms. Clark also recorded information regarding the progress of Mrs. Telles-

25   Hernandez' labor, also known as the "Friedman Curve."   Def.'s Ex. 3 at 000135; RT 531-535.

26   The documented progress in cervical dilation during Ms. Clark's ranged from 6 centimeters at 3:45

27   p.m. and again at 4:45 p.m. to "6, 7" centimeters at 6:45 p.m.  RT 531:16-534:13.  In addition, Dr.

28   Young noted that the 6 centimeters dilation began as early as 2:45 p.m.  RT 112:21-23.  Mrs.

1   Telles-Hernandez' progress in descent was from zero station at 3:45 p.m. to "0 plus 1" at 4:45 p.m.

2   RT 532:20-533:2.

3          25.     At an unknown time on the afternoon of October 11, 2002, Dr. Steele made his next

4   chart record entry, which was received into evidence.  Def.'s Exh. B at 000093; RT 623:7-25.  This

5   note indicates that Mrs. Telles-Hernandez was not tolerating uterine contractions well and had

6   declined an epidural, the fetal heart tones were in the 150s with good variability, and there was no

7   cervical change for two hours with dilation at 6 centimeters.  RT 614:23-618:18.

8          26.     Mrs. Telles-Hernandez agreed to an epidural, which was placed at 5:35 p.m.  RT

9   808:24-809:1.

10         27.     At 6:10 p.m., the fetal monitoring strip showed the first appearance of late

11  decelerations, which is a sign of hypoxia.  RT 117:17-25.

12  **E.     EVENTS OF OCTOBER 11, 2002, FROM 7:00 P.M. TO BIRTH OF PLAINTIFF**

13         28.     At approximately 7:00 p.m., Dr. Kahl returned to examine Mrs. Telles-Hernandez

14  again at the request of Dr. Steele.  RT 701:13-702:3.

15         29.     Dr. Kahl reviewed the nursing flow chart (Ex. 3 at 000128 and 000135), reviewed

16  the labor course with Dr. Steele and had a discussion with Mrs. Telles-Hernandez in which she

17  informed Ms. Telles-Hernandez that Dr. Steele had asked her to evaluate the possible need for a

18  caesarean delivery.  RT 702:11-704:4.

19         30.     Dr. Kahl was asked for a consultation because of Mrs. Telles-Hernandez' failure to

20  progress in her labor.  RT 745:22-24.  A "failure to progress" in the active phase of labor means

21  there is no cervical change in two hours despite adequate uterine forces.  RT 746:1-12.  Dr. Kahl

22  assessed Ms. Telles- Hernandez' uterine contractions as "borderline."  RT 712:18-714:5.

23         31.     Dr. Kahl assessed the fetal heart tracing and found that normal variability was

24  present throughout, even during late decelerations she discussed during her depositions which

25  occurred during a brief ten minute window of time between 7:00 p.m. and 7:30 p.m.  RT 714:25-

26  720:23. Dr. Kahl testified that "variability is critical in assessing the potential for hypoxia in a fetus

27  and thereby noting that the variability was normal, and I felt that that was a reassuring sign."  RT

28  719:9-12.

32.     Dr. Kahl was not able to strictly diagnose a failure to progress at 7:30 p.m. because of subtle changes in her cervical progress between 4:45 p.m. and 6:45 p.m., but Dr. Kahl felt that failure to progress was a likely ultimate diagnosis.  RT 746:18-748:20.

33.     At 7:30 p.m. on October 11, 2002, Dr. Steele recorded further information about Mrs. Telles-Hernandez' labor course, which document was received into evidence. Def.'s Exh. B 000087; RT 623:7-25. In this note, Dr. Steele documented that the patient was comfortable, Dr. Kahl did a recheck of the patient, discussed caesarean section delivery, but added "patient desires to wait one hour." There were also some problems with the fetal scalp electrode due to swelling occurring between fetus' skin and skull, but fetal heart tones were reassuring.  RT 618:21-622:20.

34.     By 7:30 p.m., there were repetitive late decelerations until 8:30 p.m., again a further indicator of hypoxia.  RT 119:20-22; 120:14.

35.     At 8:30 p.m., Dr. Kahl made his second consultation, and made a note of her examination, which was received into evidence.  Def.'s Ex. B at 000087; RT 710:9.  In her record, Dr. Kahl recorded "slow progress" in labor.  RT 705:22-25.  She found Mrs. Telles-Hernandez to be 6-7 centimeters dilated.  RT 707:25.  The prior exam was at 6:45 p.m. and showed 6-7 centimeters dilation.  RT 708:17-18.  Thus, by 8:30 p.m., Dr. Kahl diagnosed Mrs. Telles-Hernandez as having active phase arrest.  RT 708:23-709:16.

36.     At this time, Mrs. Telles-Hernandez consented to the caesarean surgery, as documented by Dr. Kahl in her note.  Def.'s Ex. B at 00092; RT 724:11-726:23; 728:19.

37.     Dr. Kahl testified she was not the physician primarily caring for Mrs. Telles-Hernandez until she was wheeled through the operating room doors at approximately 8:30 p.m., after Mrs. Telles-Hernandez signed the consent to the caesarean surgery.  RT 732:16-733:23.

38.     Dr. Kahl dictated a report of the caesarean surgery, which was received into evidence.  Ex. A at 298-300; RT 731:18.  In the operation record, Dr. Kahl said "at the time of the caesarean section, a reactive tracing was noted."  RT 730:17-20.  This meant that after Mrs. Telles-Hernandez was moved to the operating room and placed back on the fetal heart monitor, there was a tracing obtained showing the baby was reactive, by which Dr. Kahl meant "normal variability with two accelerations of 15 beats in a 20 minute period.  RT 730:21-731:11.

39.     Upon making the incision and entering the uterus, Dr. Kahl noted "foul smelling fluid," which is indicative of chorioamnionitis. Def.'s Exh. A., pg. 299; RT 1061:5-9.

**F.     CLINICAL DATA AFTER PLAINTIFF CRUZ HERNANDEZ' BIRTH**

40.     Cruz Hernandez was born at approximately 9:44 p.m. on October 11, 2002.  Def.'s Exh. N (Report of Julian T. Parer, M.D.) at 2; see Def.'s Ex. T (Report of Philip E. Young, M.D., giving delivery time of 9:42 p.m.).

41.     He received Apgar scores of 5 at one minute and 7 at 5 minutes.  Def.'s Ex. B at 000092; RT 142:19-24 (Dr. Young), RT 294:10-12 (Dr. Olson). The Apgar test has five components that make up the aggregate test score; each component may be scored "0," "1" or "2," for a maximum aggregate of "10."

42.     The Apgar score consists of objective, subjective and combined objective/subjective components. Measuring heart rate and respiratory rate is objective; tone and color are subjective; reflexes are a combination of objective and subjective observations.  RT 956:6-10.

43.     Plaintiff received a score of "2" for heart rate, because his heart rate was above 100 beats per minute at one minute and at five minutes and therefore was a normal heart rate.  RT 951:21-954:12.

44.     For respiratory rate, Plaintiff received a "1" at one minute and again at five minutes, which meant Cruz was not breathing at a rate more than 40-50 breaths per minute.  RT 954:17-23.

45.     As for tone, Plaintiff received a "0" at one minute, meaning he was limp, which improved to a 1 at 5 minutes, meaning he was active.  RT 954:24-955:7.

46.     The next component of the Apgar test was for reflexes, and Cruz Hernandez received a 1 at 1 minute and a 1 at 5 minutes, because he grimaced in response to stimulus.  RT 955:9-956:1.

47.     The final Apgar component was color, and Cruz Hernandez received a score of 1 at 1 minute, which improved to 2 at 5 minutes. A score of 1 meant his extremities were blue; a score of 2 meant he was pink all over.  RT 956:5-957:4.

48.      One hour after birth, Cruz Hernandez' blood sample showed a pH of 7.32.  RT 146:5-147:3 (Dr. Young); RT 295:2-25 (Dr. Olson: pH above 7, not unusual); RT 976:18-25 (Dr. Martin).

49.      The same blood test showed a base excess of minus 5.  RT 1226:22-1227:8 (Dr. Parer), RT 976:18-25 (Dr. Martin).

**G.    MEDICAL EXPERT TESTIMONY**

50.      The parties agree that Mrs. Telles-Hernandez suffered from chorioamnionitis. Chorioamnionitis is an infection in the fetal membrane (womb) and is frequently associated with prolonged labor.

51.      Dr. Donald Olson, Plaintiff's expert on causation, testified and explained how the infectious process causes damage to the brain.  He opined that with respect to Plaintiff as well as in many other fetuses where the mother has some degree of infection or the placenta has some kind of infection, even if the fetus is not directly infected with a germ, a bacteria or a virus, the mother's body is mounting an immune response against the infection in her.  Although the infection itself may not necessarily enter the fetus, the chemicals generated by the mother's body in response to the infection cross the placenta, go through the umbilical cord, enter the fetus's circulatory system and cause various stresses on the fetus.  As such, he opined that the infection causes physiological stress in the fetus as well as potentially some direct damage, even in the absence of a direct infection of the fetus, himself or herself.  RT 266:23-267:10.

52.      Dr. Philip Young, Plaintiff's expert inter alia on standard of care, testified: "But everybody says that [the injury is] due to infection. And I think that's probably right."  RT 128:16-21.

53.      Dr. Yvonne Wu, a pediatric neurologist and epidemiologist whose research is focused on chorioamnionitis and cerebral palsy, opined that Mrs. Telles-Hernandez had chorioamnionitis based primarily on the observation of foul-smelling amniotic fluid during the C-Section.  RT 1061:10-15.

54.      Dr. Wu further testified that: the risk of cerebral palsy in term infants in general is 1 in 1500; the risk of cerebral palsy if the mother has chorioamnionitis rises to about 1 in 350; and

the likelihood that chorioamnionitis caused the Plaintiff's cerebral palsy is around 75 percent.  RT 1062:18-19 ("The risk of cerebral palsy in term infants, in general, is 1 in 1500"); RT 1062:20-23 ("If mom has clinical chorioamnionitis, the risk then is increased by four-fold, so what you get is a risk of 4 in 1500. Or I think that's about 1 in 350, if you want to just be–estimate it"); RT 1064:3 ("And the answer to that is around 75 percent"); RT 1064:20-24 ("So I think based on our numbers, I'm very comfortable saying – I can't tell you with a hundred percent assurety (phonetic) that the chorioamnionitis causes cerebral palsy, but I think it's more likely than not that it did based on  these calculations").

55.     Dr. Gilbert Martin, a neonatologist, testified that the Plaintiff's brain injury was caused by an inflammatory reaction to his mother's intrauterine infection, not due to perinatal asphyxia.  RT 958:1-22.  In so concluding, Dr. Martin noted the presence of foul-smelling amniotic fluid during the caesarian section, Apgar scores of 5 at one minute and 7 at five minutes, the presence of a macular rash on the Plaintiff after the C-Section (signifying that fetus had been exposed to cytokines), a normal blood pH, a very low base deficit, a capillary refill of less than three seconds, normal white blood cell counts, relative sparing of the basal ganglia, which is consistent with fetal inflammatory response syndrome but not an acute hypoxic-ischemic insult, and normal renal function.  RT 948-987.

56.     In addition to the causal connection between chorioamnionitis and cerebral palsy, credible expert testimony also established that hypoxic ischemic encephalopathy (HIE) was another contributing cause of Plaintiff's injury that in conjunction with chorioamnionitis, caused the cerebral palsy.  The lack of oxygen begins as hypoxia and can worsen into asphyxia.  RT 104:11-22; 266:8-17.  The presence of HIE in the baby can be detected during labor through the fetal heart monitor.  A late deceleration of the fetus' heart rate after a contraction is an indicator of HIE.  RT 104:12-21.  As the hypoxia worsens, the fetus loses beat-to-beat variability (which is a normal fluctuation in the fetal heartrate), which also is detectable.  RT 104:22-105:5.

57.     Dr. Young testified that beginning at 6:10 p.m. on October 11, 2002, the fetal heart monitor first records a contraction followed by a late deceleration, the first sign of HIE.  RT 117:2-15.

58.     Beginning at 7:03 p.m. on October 11, 2002, Young noted that there was a series of troubling repetitive late decelerations. RT 119:11.

59.     By 8:30 p.m., Dr. Young noted that the late decelerations were accompanied by the loss of beat-to-beat variability, which he opined indicates the beginning of the "stair steps to death" due to hypoxia and eventually asphyxia.  RT 124:10-14.

60.     Dr. Olson first discussed the role of chorioamnionitis and acknowledged that "inflammation by itself can cause injury to babies but that it creates an environment on which superimposed insults can cause more injury than they would otherwise."  RT 270:25-271:1-2.

61.     Olson ultimately concluded that "the primary final injury to the brain is one of decreased oxygen and blood flow, and that the injury to the brain is made worse in this baby because of the exposure to an inflammatory process, an infection process in the mother and maybe in the baby himself."  RT 265:6-11.

62.     In describing the relationship between chorioamnionitis and HIE, Olson characterized both conditions as "work[ing] in concert together more than they act independently. So maybe a baby tolerates the inflammatory response without a problem. Maybe they tolerate some hypoxia for a while without a problem, but together the two are synergistic."  RT 278:11-15.

63.     Defense expert Dr. Jerome Barakos, a neuroradiologist, testified that based on CT and MRI scans of Plaintiff's brain, it was not possible to determine whether Plaintiff's injury was caused by HIE or Chorioamnionitis, or a combination of the two. RT 468:2-8.

## CONCLUSIONS OF LAW

### A.     JURISDICTION AND VENUE

1.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).

2.     Venue is proper in the Northern District of California, because the acts or the omissions complained of occurred in this District.  28 U.S.C. § 1402(b).

### B.     LEGAL STANDARD

3.     The FTCA provides that the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United

1    States, if a private person, would be held liable to the claimant in accordance with the law of the

2    place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

3        4.    The Court determines what substantive law controls the rights and liabilities of the

4    parties by applying the choice-of-law rules of the jurisdiction where the government acts or

5    omissions occurred.  Richards v. United States, 369 U.S. 1, 11-12 (1962).  Because the alleged

6    government acts or omissions occurred within this district, California law applies.

7        5.    In California, the elements of a medical malpractice claim are: (1) a duty to use such

8    skill, prudence, and diligence as other members of the profession commonly possess and exercise;

9    (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the

10   injury; and (4) resulting loss or damage.  Hanson v. Grode, 76 Cal.App.4th 601, 606 (1999).

11       6.    Plaintiff must prove each element by a preponderance of the evidence.  Mgmt.

12   Activities, Inc. v. United States, 21 F.Supp.2d 1157, 1174 (C.D. Cal. 1998).  Preponderance of the

13   evidence means "more likely than not."  Sandoval v. Bank of Am., 94 Cal. App. 4th 1378, 1388

14   (2002).  "Preponderance of the evidence means that the evidence on one side outweighs,

15   preponderates over, is more than, the evidence on the other side, not necessarily in number of

16   witnesses or quantity, but in its effect on those to whom it is addressed. []  In other words, the term

17   refers to "evidence that has more convincing force than that opposed to it."  People ex rel. Brown

18   v. Tri-Union Seafoods, LLC, 171 Cal. App. 4th 1549, 1567 (2009) (internal quotations and

19   citations omitted).

20       7.    "The standard of care in a medical malpractice case requires that medical service

21   providers exercise ... that degree of skill, knowledge and care ordinarily possessed and exercised by

22   members of their profession under similar circumstances."  Barris v. County of Los Angeles, 20

23   Cal.4th 101, 108 n.1 (1999).  "Because the standard of care in a medical malpractice case is a

24   matter 'peculiarly within the knowledge of experts,' expert testimony is required to 'prove or

25   disprove that the defendant performed in accordance with the standard of care' unless the

26   negligence is obvious to a layperson."  Johnson v. Superior Court, 143 Cal. App. 4th 297, 305

27   (2006).

28

8.      A surgeon must obtain an informed consent from a patient.  Physicians have a duty to inform their patients of the known risks of death or serious bodily harm associated with proposed treatments.  Cobbs v. Grant, 8 Cal.3d 229, 244 (1972); Piedra v. Dugan, 123 Cal.App.4th 1483, 1490 (2004).

9.      A physician has a duty to disclose to a patient "the available choices with respect to proposed therapy and the dangers inherently and potentially involved in each." Cobbs, 8 Cal.3d at 243; CACI 534, 535.  The scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice.  Id. at 245.  The physician must reveal to the patient such additional information as a skilled practitioner of good standing would provide under similar circumstances.  Arato v. Avedon, 5 Cal.4th 1172, 1190 (1993); Cobbs, 8 Cal.3d at 244-45.  A physician need not discuss the risks inherent in common procedures that very rarely result in serious ill effects.  Cobbs, 8 Cal.3d at 244; Piedra, 123 Cal.App.4th at 1490.

10.     The standard for disclosure is measured by a "reasonable person" standard, and the information the physician must disclose is information the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure.  Arato, 5 Cal.4th at 1186, 23 Cal.Rptr.2d 131, 858 P.2d 598 (1993).  However, "[i]f the physician knows or should know of a patient's unique concern or lack of familiarity with medical procedures, this may expand the scope of required disclosure." Truman v. Thomas, 27 Cal.3d 285, 291 (1980) (citations omitted).

C.    **DUTY OF CARE/BREACH OF DUTY**

11.     Plaintiff contends that Defendant acted below the standard of care by failing to: (a) timely order a caesarian once her labor was in arrest; (b) order a caesarian section on an "emergent" rather than "urgent" basis; and (c) provide Plaintiff's mother, Mrs. Telles-Hernandez, with adequate informed consent with respect to the risks of continuing to attempt a vaginal birth, compared with the lack of benefit to the child.  The Court finds that Plaintiff has met her burden on each of these issues.[2]

---

[2] There is no dispute that Defendant owes Plaintiff a duty of care.  However, Defendant argues that he did not breach such duty or that his acts or omissions caused Plaintiff's injuries.

12.     The Court is persuaded that the applicable standard of care required Defendant to order a caesarian delivery on October 11, 2002 at 4:45 p.m. when Mrs. Telles-Hernandez experienced an arrested labor.  RT 218:2-8.  Plaintiff's expert, Dr. Philip E. Young, whom the Court finds credible, qualified and persuasive, opined that her labor had arrested by that point in time, and that the requisite standard of care required Dr. Steele to order a caesarian section at that time, particularly given her personal and medical history and the course of labor since admittance to the hospital.  Though Defendant disputes that her labor was "arrested," both Drs. Kahl and Steele testified that they saw no cervical change for two hours and agreed that Mrs. Telles-Hernandez was not going to make any further progress with her labor.

13.     Dr. Julian T. Parer, one of the Defendant's testifying medical experts, opined that there was "no time during that labor that the standard of care" required a caesarian delivery.  RT 1151:15-22.  He reached this conclusion "because the labor was progressing."  Id. 1151:23-24.  Yet, Dr. Kahl, who, unlike Dr. Parer, actually examined Mrs. Telles-Hernandez, observed that Mrs. Telles-Hernandez had made no progress in two hours and was unlikely to delivery vaginally.  RT 746:2-7, 20-23, 749:3-4.  Dr. Parer also stated that there was "no particular hazard" to waiting longer to attempt a vaginal delivery, but yet, Dr. Steele, who was managing Mrs. Telles-Hernandez' labor, acknowledged that in the absence of progress in labor, "the risks outweigh the benefit to continuing…."  RT 911:12-16.  The Court declines to credit Dr. Parer's opinion regarding the standard of care in this instance given his failure to consider any of the specific factors germane to Mrs. Telles-Hernandez' situation.  Importantly, these factors include the fact that she had been admitted two days earlier with ruptured membranes, and the fact her size, weight and socio-economic and primup status, all of which militated against the likelihood that she would be able to deliver vaginally.

14.     Dr. Young is board-certified OB/GYN and expert in the field.  He is a 1965 graduate of Harvard Medical School and has extensive, credible and documented experience in this specialty.   Defendant's challenges to Dr. Young's credibility are unavailing.  They contend that his testimony was inconsistent as to whether he currently maintains a clinical practice delivering babies, claiming that his last delivery was in 2000.  While it is true that Dr. Young ceased actual

1  deliveries from 2000 through 2008, he has continued to work as the attending physician at the

2  University of California at San Diego, which is a teaching hospital, where he consults with

3  residents and performs deliveries with them.  In addition, Dr. Young's prior experience includes

4  delivering thousands of babies.  The Court finds that Dr. Young provided credible, supportable

5  testimony, which was persuasive and probative of the issues critical to this case.

6         15.     The Court also finds that Mrs. Telles-Hernandez was not adequately advised of the

7  risks associated her desire to wait for a vaginal birth, particularly once her labor had arrested.

8  Though Drs. Kahl and Steele claim they discussed the possibility of proceeding with a caesarian

9  section, the record demonstrates that Mrs. Telles-Hernandez was never sufficiently informed of

10  what they were asking her to consider.  She was never advised of the lack of benefit to be gained

11  from delaying further in the hopes of delivering her baby vaginally or that such delay placed her

12  child at risk of harm.  The Court is persuaded by the evidence that, based on Mrs. Telles-

13  Hernandez' emphasis on prenatal care, and her desire to deliver her baby without the use of

14  medication, coupled with her testimony at trial, it is more likely than not that she would have opted

15  for a caesarian section as early as was necessary to avoid risks to her child, but certainly prior to

16  October 11, 2002 at 4:45 p.m. (when her labor effectively ceased, RT 218:5-10) had she been

17  properly advised of the risks associated with further delaying her childbirth.

18         16.     Credible expert testimony at trial confirmed that an urgent caesarian section is used

19  when there is an arrest of labor but without fetal distress.  This allows the surgery to take place

20  within one to two hours.  However, if there is accompanying fetal distress, the standard of care

21  requires that the caesarian be classified as emergent, which requires that that it take place in

22  approximately 30 minutes.

23  **D.  CAUSATION**

24         17.     The burden of proof with respect to causation rests with the plaintiff.  Vasquez v.

25  Residential Investments, Inc., 118 Cal. App. 4th 269, 288 (2004).

26         18.     Plaintiff must prove factual and proximate causation, based on competent expert

27  testimony.  Jones v. United States, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (citing Jones v. Ortho

28  Pharmaceutical Corp., 163 Cal. App. 3d 396, 402-403 (1985) and Daubert v. Merrell Dow

Pharmaceuticals, Inc., 43 F. 3d 1311, 1320 (9th Cir. 1995)).  The plaintiff must show both general and specific causation; general causation is a showing that the defendant's conduct increased the likelihood of injury, and specific causation is a showing that the defendant's conduct was the probable, not merely a possible, cause of the injury.  Id.

19.     To establish causation in fact, the plaintiff must establish that the defendant's conduct was "a substantial factor in bringing about the injury."  Lombardo v. Huysentruyt, 91 Cal. App. 4th 656, 665-666 (2001).

20.     Proximate cause requires: (1) cause in fact, namely whether defendant's act was a necessary antecedent of an event, and (2) policy considerations limiting legal responsibility for the consequences of that act. PPG Indus., Inc. v. Transamerica Ins. Co., 20 Cal. 4th 310, 315 (1999).

21.     The record presented is sufficient to convince the Court that Defendant's breaches of the standard of care were a substantial factor in causing the harm suffered by Plaintiff.  First, the Court is persuaded that Defendant failed to adequately advise Mrs. Telles-Hernandez of the risks and corresponding lack of benefit associated with a delayed caesarian section, particularly given the various risk factors which she presented.  The record shows clearly that Mrs. Telles-Hernandez was particularly conscientious regarding her prenatal care, and that there were no indications of any problems with her pregnancy or the fetus when she entered the hospital.  Her heightened concern for the welfare of Plaintiff is also exemplified by the fact that she desired to have a natural (vaginal) childbirth without resorting to the use of medications.  Though Drs. Steele and Kahl claimed they discussed the option of having a caesarian section with Mrs. Telles-Hernandez at various times, it is also clear that they never warned her of the risks to the fetus caused by delaying delivery.  They never truly advised her of the decision they were asking her to make. At a minimum, Defendant should have warned her by late afternoon on October 11, 2002 that her labor had arrested, that the likelihood of further progress and a vaginal delivery were slim, and of the serious risks of continuing to wait.  The Court is convinced that had Mrs. Telles-Hernandez been advised that further delay posed risks to the health of her fetus with no corresponding benefit, she would have opted for a caesarian section at that time.

22.     The record shows that at that time, and there is no dispute that, the signs were that Plaintiff still was healthy.  RT 113:11-12.  As such, the failure to adequately advise Mrs. Telles-Hernandez, in contravention to the standard of care, resulted in delaying the delivery of an apparently healthy Plaintiff which proximately caused him to suffer the injuries alleged in the pleadings.  Thus, Defendant's failure to warn Mrs. Telles-Hernandez of the risks associated with further delay was a substantial factor in contributing to the harm suffered by Plaintiff.  See CACI 430.

23.     Likewise, the Court is convinced that Defendant's failure to order a caesarian section on October 11, 2002 by 4:45 p.m. when her labor had arrested also was a substantial factor in causing Plaintiff's injuries.  The record shows that during the time period in which Plaintiff's labor had arrested, she began to experience late decelerations which both parties' experts agree is a red flag for hypoxia.  As noted, Plaintiff's membranes had ruptured almost two days earlier, which itself is another red flag.  Moreover, Plaintiff exhibited various risk factors which weighed against the likelihood of a vaginal delivery.  Defendant thus should have ordered a caesarian section at that time.  By his own acknowledgement, by that point further delay increased the risk of damage to the fetus with no corresponding benefit.

24.     Credible expert testimony also supports the conclusion that Plaintiff's hypoxic condition was a contributing factor in causing Plaintiff's injuries.  Dr. Olsen testified that Mrs. Telles-Hernandez' infection rendered her fetus more susceptible to physiological stress and injury due to hypoxia than might otherwise have been tolerated in the absence of chorioamnionitis.  Dr. Olsen, whom the Court finds very credible, qualified and persuasive to render expert testimony, also opined that Plaintiff's hypoxic condition was a causative factor Plaintiff's development of cerebral palsy.  RT 265:5-11, 269:15-21.

25.     Defendant's contention that Plaintiff was not hypoxic is uncompelling.  He points to Plaintiff's Apgar scores as being within normal range.  However, Apgar scores are just one measure of newborn functioning among the many factors to be considered, and are not singularly determinative of whether the newborn is hypoxic or suffering from brain deficits.  In addition, at

1   the same time, Defendant's experts acknowledged that Plaintiff was born with blue skin coloration

2   and a limp body, both of which are indicators of hypoxia.

3       26.     The evidence presented supports the conclusion that Plaintiff was a healthy baby up

4   to the point in time when his mother's labor had arrested.  Given the red flags, the risk factors

5   militating against the likelihood of a vaginal delivery, and the mounting warning signs that Plaintiff

6   was becoming hypoxic, the applicable standard of care required Defendant to order a caesarian

7   section at that time.  The Court is persuaded by the evidence that had he done so, it is more likely

8   than not that Plaintiff would not have been born with cerebral palsy.

9       27.     Finally, the Court finds that Plaintiff's injuries could have been avoided or certainly

10  lessened to a considerable degree had Defendant comported himself consistent with the standard of

11  care by ordering a caesarian section on an emergent as opposed to urgent basis.  When the decision

12  was finally made to perform a caesarian section, Drs. Steele and Kahl opted for an urgent, rather

13  than emergent caesarian section.  An urgent caesarian section is used when there is an arrest of

14  labor; however, according to Dr. Young, in a situation such present here where there is fetal

15  distress, the standard of care requires that an emergent section be called.

16      28.     Dr. Young opined that at 8:30 p.m. on October 11, 2002, when Drs. Steele and Kahl

17  called for the caesarian section, there were clear signs of fetal distress—among them, repetitive late

18  decelerations, loss of beat-to-beat variability, and tachycardia.  Dr. Young characterized this

19  situation as "stair steps to death," as tachycardia (heart rate too high) can develop into bradycardia

20  (heart rate too slow), eventually leading to death.  RT 124:10-126:13.

21      29.     Had the caesarian been ordered on an emergent basis, the procedure could have

22  been completed in less than 30 minutes, meaning that the procedure could have been completed by

23  9:00 p.m.  RT 126:20-21.  Instead, the caesarian was classified as urgent, which resulted in the

24  procedure not taking place until approximately another hour and a half had transpired at 9:44 p.m.

25  Def.'s Ex. N; RT 126:11-13.  In addition, no fetal monitoring was performed on Plaintiff from 9:05

26  p.m., and as such, Defendant was unaware of Plaintiff's condition from that time until birth.  RT

27  127:2-6.  Given the rapid deterioration of brain matter that results from a severe hypoxic condition,

28  it is more likely than not that the failure to order the caesarian section on an emergent basis was a

substantial factor in causing Plaintiff's injuries.  Though Defendant attempts to shift responsibility for the calling for an urgent caesarian section to Dr. Kahl, the record shows that Dr. Steele remained responsible for Plaintiff's care during that time period.

30.     In sum, the Court finds that Plaintiff has demonstrated within a reasonable medical probability based on competent medical expert testimony that Defendant's failure to comport with the requisite standard of care caused Plaintiff's injuries.  See Jones, 163 Cal.App.3d at 402.

**E.     DAMAGES**

31.     Plaintiff has demonstrated by a preponderance of the evidence that he has been damaged as a result of Defendant's conduct.  As such, Plaintiff is entitled to both economic and noneconomic damages.  CACI 3902.

32.     Noneconomic damages mean "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation."  Cal. Civ. Code § 1431.2(b)(2).  Under the California Medical Injury Compensation Reform Act (MICRA), noneconomic damages for claims based on professional negligence of health care providers are limited to a maximum of $250,000.  See Cal. Civ.Code § 3333.2.

33.     Economic damages means "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities."  Id. § 1431.2(b)(1).  There is no cap on economic damages under MICRA.  See Fein v. Permanente Medical Group, 38 Cal. 3d 137, 159 (1985).

34.     Future damages awards in medical malpractice actions in the amount of $50,000 or more are subject to the periodic payment provisions set forth in California Code of Civil Procedure section 667.7.  "Future damages" are defined in section 667.7(e)(1) to include both economic and noneconomic damages: "'Future damages' includes damages for future medical treatment, care or custody, loss of future earnings, loss of bodily function, or future pain and suffering of the judgment creditor."

35.     Defendant's contention that Plaintiff failed to present any testimony in support of his claim for noneconomic damages is unavailing.  It is undisputed that Plaintiff suffers from cerebral palsy, severe mental retardation, epilepsy and seizures, is feeding tube reliant and a quadraplegic, among other conditions.  Plaintiff's injuries have caused him significant past and future physical pain and mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief and anxiety.

36.     Although Plaintiff demonstrated that he received past medical care, he did not provide evidentiary support for past medical expenses, nor is it clear that he is seeking such relief. As such, the Court finds there is no basis for such an award.

37.     Plaintiff seeks **$1,007,644** (present cash value) for future earnings loss, which is based on the expert report of his economist, Wayne Lancaster.  See Pl.'s Ex. 37.  Plaintiff's expert's calculation is predicated on the assumption that Plaintiff would have completed high school, worked continuously from age 18 to 65 and is entitled to a fringe benefit of 26%.  Relying on its expert, Mark Cohen, Defendant argues that:  (1) it is unreasonable to assume that Plaintiff would have worked continuously without any break due to unemployment, disability or other time out of work; (2) the fringe benefit should be 15.43% based on the Bureau of Labor statistics; and (3) Plaintiff's earning capacity should be reduced because it is not clear that he would have graduated from high school given that his mother graduated while his father did not.  See Def.'s Ex. J at 3.  However, Defendant fails to specify the amount by which Plaintiff's future earnings loss should be reduced.  In addition, the Court finds unsupported Mr. Cohen's assumption that there is a 50 percent chance that Plaintiff would not have graduated from high school (hence, lowering his earning capacity) because his father did not graduate.  To the contrary, the evidence supports the conclusion that Mrs. Telles-Hernandez—who is a high school graduate—is a conscientious parent and would have ensured to the best of her abilities that Plaintiff would have completed his high school education if he were able to do so.  Taking all these considerations into account, the Court awards Plaintiff future earnings loss in the amount of $1,007,644 (present value).

38.     Plaintiff seeks **$3,760,716** for future care costs based on the present cash value Tables S1 and S2 attached to the report of Mr. Lancaster.  The nine categories of economic expenses that Plaintiff will require consist of:

a.      Skilled nursing care for Plaintiff as well as a home health aide should be provided through an agency.  RT 640:19-25.  Plaintiff has required and will continue to require the care of physicians.  RT 647:15-22.  Plaintiff will need a nurse care manager for 12 hours per year, some family counseling, the hospital for dental sedation, and a nutritionist.  RT 647:23–648:5.

b.      Plaintiff has and will need a wheelchair and wheelchair maintenance.  RT 643:11–644:3.

c.      Plaintiff will need medications which he is currently taking.  RT 644:5-13.

d.      Plaintiff should have Botox injections in his extremities at varying levels to help him deal with the tightness in his extremities.  RT 644:15-22.

e.      Occupational therapy will help Plaintiff with the activities of daily living.  RT 645:2-13.  Physical therapy will help him maintain his physical strength.  RT 645:14-17.

f.      Plaintiff will need durable equipment throughout his life.  RT648:12-20.

g.      Dr. BeDell identified diagnostic testing, labs, x-rays that will be necessary for him over his life.  RT 651:9-15.

h.      There will be future hospitalizations that Plaintiff will need over his life.  RT 652:7–653:6.

i.      There are also home modifications that will need to be made to accommodate Plaintiff.  RT 653:14–654:14.

39.     Defendant relies on their expert life care planner, Linda Olzack, and argues that Plaintiff's costs could be reduced by reliance on in-home attendant care through IHSS or placement in a group home or other institution.  Based on the information presented, the Court is unpersuaded that state-provided in-home care services constitute a viable substitute for the services proposed by Plaintiff (as set forth in Mr. Lancaster's report).  In addition, the Court notes that due to California's fiscal crisis, the State is attempting to reduce IHSS benefits, which thus raises serious questions whether such benefits would be available.  See Martinez v. Schwarzenegger, 2009 WL

1844989 (N.D. Cal., June 26, 2009).  As for the alternative option proposed by Defendant, institutionalization would mean separating Plaintiff from his family, which Mrs. Hernandez-Telles (and likely Plaintiff as well) understandably finds undesireable.  In addition, institutionalization is arguably violative of the integration mandate of the Americans with Disabilities Act.  <u>See</u> <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 592, 600-601 (1999); <u>Townsend v. Quasim</u>, 328 F.3d 511, 515-18 (9th Cir. 2003).  The Court therefore finds that Plaintiff is entitled to $3,760,716 in future care costs, subject to California Code of Civil Procedure section 667.7.

40.     Defendant contends that the monthly disability payments, In-Home Supportive Services (IHSS) and medical treatment paid by Children Services should be deducted from any recovery awarded to Plaintiff as "collateral sources" under Civil Code section 3333.1.  However, Defendant concedes that there is no controlling legal authority establishing that these particular payments and the value of such services are required to be deducted from any damage award. Even if such authority were presented, Defendant did not present any evidence at trial regarding the value of these services to allow the Court to determine what amount, if any, should be included as an offset to any damage award.

41.     Plaintiff is awarded total damages in the present cash value of $4,768,360.00, less $59,998 received by Plaintiff in connection with his settlements with Sutter Medical Center of Santa Rosa and Dr. Kahl.  Said award is subject to the periodic payment provisions of MICRA.  In the event Defendant elects to invoke the periodic payment provisions set forth in California Code of Civil Procedure section 667.7, the parties shall so notify the Court and thereupon the matter will be referred to a Magistrate Judge of this Court for further determination, if necessary.

42.     Plaintiff is entitled to pre-judgment interest, as authorized by the FTCA.  <u>See</u> 28 U.S.C. § 2674.

For the reasons stated above,

1   IT IS HEREBY ORDERED THAT in accordance with this Order, final judgment shall be

2 entered in favor of Plaintiff.  The Clerk shall close the file and terminate any pending matters.

3   IT IS SO ORDERED.

4

5 Dated: September 30, 2009      _____

             SAUNDRA BROWN ARMSTRONG

6             United States District Judge